CHAMPAIGN *v.* DETROIT UNITED RAILWAY.

1. Street Railways — Personal Injuries — Evidence of Neglect
to Give Signals.

Evidence that plaintiff and her husband, who were driving
along the street car track of defendant on a bright, clear
day, turned to look for a car before crossing the track,
but observed no car approaching; that they heard no bell
or other signal, and that their vehicle was struck as they
were passing over the track, and was overturned, throw-
ing them out and injuring them; that they did not see
or hear the car until it struck the rig, met by testimony
of defendant showing that the speed of the car was
moderate; that signals were given, and the car only
struck the vehicle slightly, doing no injury to it, and was
promptly stopped, supported by the statements of sub-
stantially all the witnesses who saw the accident that they
heard the bell sounded, reviewed, and *held*, to be insuffi-
cient to establish negligence in the failing to give warn-
ing signals.

2. Same—Signals—Bell.

In the middle of a block, with nothing to indicate the
probability of any accident, it is not the duty of the motor-
man to sound his gong continuously.

3. Same—Discovered Negligence—Last Clear Chance.

The rule of discovered or subsequent negligence has no
application to a case in which the plaintiff, driving along
a car track about 30 feet in advance of a street car, at-
tempted to turn and cross the track; the motorman re-
ceiving no intimation that plaintiff intended to cross in
front of the car.

4. Same—Contributory Negligence.

Where plaintiff or the driver could not have failed to per-
ceive the oncoming car if they had looked with ordinary
care, in the absence of evidence that the car was running
at a high rate of speed, contributory negligence will pre-
clude her recovery.

5. Same—Appeal and Error—Striking Out Testimony.

And where the testimony of a witness, who stated that she

saw the car as it passed and testified relative to its rate of speed, was struck out by the court, saying in so ruling, "if she didn't see the car, you can strike that out," and plaintiff's counsel did not attempt to explain the matter or bring out what the witness had observed in answer to the suggestion of the court, but merely excepted, reversible error was not made out.

Error to Wayne; Van Zile, J. Submitted June 4, 1914. (Docket No. 21.) Decided July 24, 1914.

Case by Mary Champaign against the Detroit United Railway for personal injuries. Judgment for defendant on a directed verdict. Plaintiff brings error. Affirmed.

*Ignatius J. Salliotte,* for appellant.

*Corliss, Leete & Joslyn (William G. Fitzpatrick,* of counsel), for appellee.

STEERE, J. This action was brought by plaintiff to recover damages for personal injuries resulting from a collision between one of defendant's street cars and a market wagon in which she, riding with her husband, was attempting to cross defendant's tracks in front of an approaching car. She has removed the case to this court by writ of error for review of a judgment on directed verdict in favor of defendant.

It was the opinion of the trial court that plaintiff's proofs failed to disclose any actionable negligence on the part of defendant, and that the accident was attributable solely to the rig in which plaintiff was riding being unexpectedly, and without previous indication of such purpose, turned upon the street car tracks at a time when a passing car was so close that it was impossible for the motorman to stop it in time to avoid the collision.

Plaintiff, a married woman near 60 years of age,

resided with her husband on a farm in the township of Ecorse, near the city of Detroit. They were engaged in farming and market gardening. In the forenoon of September 8, 1911, they were going home from the western market of Detroit where they had taken a load of tomatoes, driving with an empty market wagon drawn by a single horse, eight years old and gentle. Their route home led westerly along Jefferson avenue, on which was a double track of defendant where cars were running in each direction at frequent intervals. They were familiar with the street and knew this. The portions of the thoroughfare used as a driveway for vehicles on each side of the street car tracks were about 17½ feet wide. In going west towards their home the proper side for them to drive was on the north or right of the tracks. This they did for some distance until near where the track of the Detroit, Toledo & Ironton Railroad crossed the street, when they crossed to the south or left side to avoid an excavation on the north side for water mains. They drove along the south side for quite a distance past the excavation, keeping about halfway between the curb and car track, to a point some distance beyond the steam railroad crossing and about midway between Portland and Polaski streets, which crossed Jefferson avenue, when, after meeting two loaded sand wagons going east, the husband, who was driving, turned the horse sharply to the right, intending to recross the street car tracks and get back on the right side of the street again. Both claimed to have looked and listened, and neither to have seen or heard any approaching car, but a west-bound car came in contact with their wagon before it cleared the track, with sufficient force to tip it over, throwing them out. In her fall plaintiff sustained a fractured clavicle and other injuries, from which she was incapacitated for some time, and at the trial claimed to have not fully recovered. The horse was not injured

and the wagon was in condition to continue the journey with it.

The negligence alleged in plaintiff's declaration is stated to be that the car, "without giving warning of its approach by sounding its gong and otherwise, and being propelled at a great and excessive rate of speed, struck the wagon in which plaintiff and her husband were then riding," etc. The record furnishes no evidence that the car was being run at an unusual, unlawful, or excessive speed prior to the time the conveyance turned across the car track. The various witnesses who testify as to the rate of speed place it from 10 to 14 miles per hour. The highest estimate given was by a witness named Aston, called by defendant, a passenger on the car, who stated the speed to be from 12 to 14 miles per hour, which was first slackened by a sudden application of the air brakes, which "lifted the people right out of their seats in the car." As bearing upon the rate of speed and promptness of the stop made by the car, he testified that his attention was first attracted by a loud sounding of the gong, accompanied by application of the brakes, and looking up he saw the rig crossing the track about 15 or 20 feet ahead, being then about the middle of the track, and he said:

"The car didn't hit the wagon very hard. It jarred the wagon slightly, and then shoved it, and the wagon tipped over. It didn't hit the wagon sufficiently to knock * * * the people out of the wagon until the wagon went over, and then the people fell out. I should judge the car could not have gone over six or seven feet after it came in contact with the wagon."

Neither plaintiff nor her husband give any direct testimony as to the speed of the car, claiming they did not see it at all until they collided with it. Plaintiff in one portion of her testimony stated that there was a curve in the track which prevented them from seeing the car, and that when they attempted to cross

they were about 50 feet below the curve. She also testifies in part as follows:

"I know cars run both ways on Jefferson avenue, and I knew a car might come from the east going west at any time there, and a car might come from the west going east. I knew that long before this accident happened. * * * We could see on Jefferson avenue about 50 or 100 feet from the place where the accident happened. The car that hit the wagon was going in the same direction we were going. The back wheel of the wagon was on the track when it was hit by the front part of the car. I don't remember where the wagon was standing when I fell out of it. I know the car struck the rear end of the wagon. We turned around and looked for a car, and we didn't see no car coming. We just looked once, and then we started our horse over across the track. * * * At the time the accident happened it was nice and bright and clear."

Her husband described the conditions and circumstances of the accident in part as follows:

"Well, when I come—before I crossed—when I came to turn I looked back there. I could see about pretty close to—200 feet, about that. I was looking if I could see the car coming, so when I seen the car—I didn't see no car—so I went across. * * * I was going down alongside of the curve there about half and half between the curb and the street car track. We got struck by the car when we were crossing the track. We was pretty near passed. It only struck the hind wheel and spoke. The mark is there yet. I seen the mark. It was no more than that much from the tires right on the side, pretty near. The car just struck the wheel and then he turned the wagon around, swung around there, and then we went upside down. * * * "

Cross-examination:

"I knew I might expect a car going either direction along there any minute. * * * I looked when I come to turn to cross, I looked below the turn. I only looked back once, then I crossed.

"*Q.* And that is just before you started to cross the track?

"*A.* I was on the track; yes, sir.

"*Q.* You were on the track when you looked?

"*A.* Well, I was just turning there; I was on the track; I was just turning to cross.

"*Q.* Didn't you look for the car until you were on the track?

"*A.* Well, just as I started to turn to cross I looked for a car; I didn't see any. * * *

"*Q.* Now, how did you turn across the street car track?

"*A.* Well, I turned my horse to go across.

"*Q.* Yes, I know; but I mean how was the turn made? Was it a sharp turn, or did you just go angling across?

"*A.* No, I turned sharp, a sharp turn, right turned sharp. * * *

"*Q.* When you got to this point you turned square across the track?

"*A.* Of course. * * *

"*Q.* Now, just before you turned to make that crossing did you stop your horse?

"*A.* No, sir.

"*Q.* Did you look for the car then?

"*A.* When I go across I look.

"*Q.* Just as you turned?

"*A.* Yes, sir.

"*Q.* All right; how did you look?

"*A.* Well, you see, I turned back, and looked back about 25 feet or more, and then I didn't see no car, and I didn't hear any noise, so I went across. * * *

"*Q.* When you turned around and looked that time how far could you see along the street car tracks, back towards the Lima bridge?

"*A.* Well, I am telling you when I started to turn to cross the street it was—I could see 200 or 250 feet, about. * * *

"*Q.* Just how far did you turn around in your seat?

"*A.* Well, I just turned that way [indicating]. Of course, the curve where the turn was was below me, so I could see only about 200 or 250 feet. I turned more than halfway around. * * * I thought it was all right. My horse was gentle, and I was going on a walk. Even without drawing the lines at all, if

I had simply said, 'Whoa,' he would have stopped at once, but I went along. My horse is not afraid of the street cars. He would stop right at the hind end of a street car if necessary. The horse wasn't hurt. The wagon was pretty well bruised."

A witness called by plaintiff, named Walter Kempa, who worked in a meat market near the scene of the accident and saw what happened, testifies in part:

Direct examination:

"The car was about 15 feet from me when I noticed it. The motorman rang the gong when he was about 15 feet away. The car did not stop before it struck these people. It went about 10 feet after it struck them before it stopped. * * * "

Cross-examination:

"When I first saw the wagon it was just crossing, coming up towards the track. The gong was ringing and the wagon kept right on coming, and by the time it got to the street car track the car got there, too, and hit the wagon, and the car went about ten feet after that."

Redirect:

"The wagon when I saw it first was just turning. I didn't notice how far the car was then. The first I noticed of the car was when I heard the gong ringing and the car was about 15 feet from the wagon."

Recross-examination:

"Q. I understood you to tell me a minute ago that when you first saw the car it was 15 feet away from the wagon, and the wagon was just starting to turn there?
"A. Yes, sir.
"Q. Is that what you mean to say now?
"A. Yes, sir; that is it.
"Q. You saw the car 15 feet away when the wagon started to turn?
"A. Yes, sir.
"Q. It was going up towards the track?
"A. Yes, sir; that is it.
"Q. Kept on coming?

"*A.* Yes, sir.

"*Q.* And the car kept coming?

"*A.* Yes, sir.

"*Q.* Kept coming, moving towards the wagon?

"*A.* Yes, sir.

"*Q.* The collision occurred and the car went about 10 feet and stopped?

"*A.* That is it.  *  *  *

"*The Court:* Where was Mr. Champaign when you saw the car 15 feet away?

"*A.* He was just turning.

"*Q.* Across?

"*A.* Yes, sir.

"*Q.* On what track, was he?

"*A.* On the right side.

"*Q.* On the right side track?

"*A.* Yes, sir; right side."

The testimony of all witnesses who saw the car immediately before the accident is in substantial harmony that it was dangerously near and in plain sight when the rig started to turn across the track, variously stating the distance at from 15 to 30 feet.

That the gong was sounded is conclusively shown. Five witnesses who saw the accident, one of whom was called by plaintiff, so testify. The attention of some, who had not previously noticed it, was attracted to the situation by the rapid ringing of the gong and sudden checking of the car. The evidence is overwhelming upon this point, with nothing to the contrary except the negative testimony of plaintiff and her husband that they did not hear it. The evidence in the case, with proper inferences therefrom, cannot be held sufficient to sustain a verdict for plaintiff on the ground that proper warning was not given as soon as the short turn of the rig toward the tracks indicated an intention to cross them. Prior to that time there is nothing to indicate any duty to give warning. The car was not running at an excessive or unlawful speed, and was in the middle of a block between crossings. The motorman was not required

to sound his gong continuously at such a place, nor until he saw, or should have seen, that some one of those who might be pursuing their course in safety along the regularly traveled ways on either side of the track indicated a purpose to cross, or approached dangerously near. This is not a case of a car coming to a crossing where it is made the duty of the motorman to give warning of its approach.

The rule of discovered negligence can have no application here. This turn upon the track was made when the car was less than 30 feet away. As soon as an intention to cross was first made apparent, the motorman did everything possible to give warning, stop the car, and avoid the accident.

Under the undisputed evidence, even the rules of contributory negligence as applied to the conduct of those attempting to go over the tracks at regular crossings preclude recovery. Plaintiff's husband was driving a gentle horse, which he states was not afraid of the cars and would have stopped at once "if I said, 'Whoa.'" It was a clear, bright day. They were in the middle of the block between crossing streets, pursuing their way in safety by the side of the tracks along which they knew cars were constantly passing, and "one might be going either direction along there any minute." They were sufficiently beyond any curve so that the driver could see at least 200 or 250 feet in the direction this car was coming, and without stopping, at a time when the car was within from 15 to 30 feet of them, they "turned sharp" upon the track in an attempt to cross. In the face of such unquestionable evidence, and particularly in the absence of evidence that the car was running at excessive speed, it cannot in reason be said that plaintiff's testimony that they looked or listened, and did not see or hear the car, raises an issue for the jury. The car came to that point running along the track. Had they looked to the extent and at the time the law requires,

they could and must have seen it. The physical facts which they themselves testify to negative their own testimony to the contrary.

The rules of requisite precaution before entering upon the short danger point to be traversed in crossing a railway have been so thoroughly reviewed in the following decisions and cases there cited that further discussion would be superfluous: *Fritz* v. *Railway Co.*, 105 Mich. 50 (62 N. W. 1007) ; *Borschall* v. *Railway*, 115 Mich. 473 (73 N. W. 551) ; *Merritt* v. *Foote*, 128 Mich. 367 (87 N. W. 262) ; *Stevenson* v. *Railway*, 167 Mich. 45 (132 N. W. 451) ; *Manos* v. *Railway*, 168 Mich. 155 (130 N. W. 664) ; *Puffer* v. *Lighting Co.*, 173 Mich. 193 (139 N. W. 19) ; *Colborne* v. *Railway*, 177 Mich. 139 (143 N. W. 32).

Error is assigned upon a conditional ruling of the court touching certain testimony of a witness named Lulu Strewling, who lived near by, at whose house plaintiff was taken and cared for, remaining for a couple of hours after the accident, which witness did not see. Amongst other things she testified:

"I didn't see the accident that occurred to them in September, 1911, until it was over. I first saw the car before it struck the wagon. I didn't hear any bell sounded. This car didn't slow down at all as it passed the curve. I was in the back of the house when this accident occurred. I was in between the two buildings in back of the house. I saw the car as it passed. After the accident Mrs. Champaign was taken to my place."

Counsel for defendant here said:

"I ask all the witness' testimony with regard to seeing the car and whether it checked up be stricken out. * * *

"*The Court:* If she didn't see the car you can strike that out."

To which counsel for plaintiff excepted without argument or explanation. Witness' statement that

she did not see the accident and was at the time in between two buildings, in back of the house, evidently left some uncertainty in the recollection of the court whether or not she testified to having actually seen the car; and so it was said that "if she didn't see" it, her statement that the car was not checked might be stricken out. No claim is made by defendant that the car was checked until the rig turned towards the track just before the accident, and witness' own testimony negatives her having seen the car at that point. The objection appears to have been somewhat frivolous and the indefinite ruling unimportant. The matter was left open for plaintiff's counsel to clear up the uncertainty and pursue the subject if desired. As this record presents the question, this uncertain ruling complained of appears immaterial, and is not reversible error.

We conclude that under the undisputed evidence in this case plaintiff has failed to establish *prima facie* the two requisites of negligence by defendant and freedom from negligence on her part.

The judgment is affirmed.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and MOORE, JJ., concurred.